UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN A. YARBROUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:10CV2 TIA |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On January 5, 2007, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability beginning May 16, 2006 due to manic depressive illness and a learning disability. (Tr. 77, 124-25, 132-35) Plaintiff's applications were denied on May 21, 2007, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 63-64, 77-81, 84) On December 12, 2008, Plaintiff appeared and testified at hearing before an ALJ. (Tr. 6-61) In a decision dated February 27, 2009, the ALJ determined that Plaintiff was not under a disability from May 16, 2006 through the date of the decision. (Tr. 68-76) After reviewing additional evidence, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1-5) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Upon questioning by the ALJ, Plaintiff testified that he had never been married but had a 6-year-old son.  Plaintiff was 39 years old and graduated from high school.  He attended special education classes in the 11th and 12th grades.  However, he testified that he started having trouble in school in 9th grade.  Plaintiff weighed 180 pounds and measured 5 feet 9 inches.  He was able to read and write, as well as add and subtract.  He used a computer only to access the internet.  However, he did not own a computer and occasionally used computers belonging to family members.  Plaintiff lived in a trailer with his son and his son's mom.  Plaintiff was jailed for stealing a car when he was 15 years old.  (Tr. 12-16)

Plaintiff stated that his son's mother made about $800 per month, and his parents helped pay the rest of the bills.  He had never filed a worker's compensation claim or previous applications for disability.  He received Medicaid.  With regard to previous work, Plaintiff testified that he had been very depressed and unable to get out of bed.  He missed a lot of work days, and his employer eventually fired him. Plaintiff last worked for about 4 years at Lumby Enterprises, inspecting Chrysler parts.  He visually inspected parts moving along an assembly line and packed them into boxes.  Plaintiff lifted between 15 and 40 pounds.  However, he testified that he had no lifting limitations and could lift as much as 100 pounds.  Prior to his job at Lumby Enterprises, Plaintiff worked a variety of short-term jobs through a temporary service.  Plaintiff also worked at True Manufacturing pushing assembled treadmills into boxes.  In addition, he previously worked for Natoly Engineering as a parts polisher.  Plaintiff was fired from both of these jobs due to his depression.  In addition, he worked for Lumby Enterprises in 1992 as a parts inspector, and he also worked with the telephone company

as an installer assistant.  (Tr. 17-22)

Plaintiff testified that his depression kept him from being able to work.  He was unable to get out of bed at any scheduled time, and the medication caused him to sleep a lot.  In addition, Plaintiff had a previous drug dependence disorder.  He last smoked marijuana and used cocaine, acid, mushrooms, and amphetamines about 4 years ago.  He started using marijuana when he was 15 years old and progressed to heavier drugs at age 17.  His grades started falling as a result of drug use.  While Plaintiff used other drugs, marijuana was his drug of choice.  Plaintiff testified that he had not used any drugs, other than prescribed drugs, for 4 years.  (Tr. 22-24)

Plaintiff stated that he suffered from manic depressive illness.  During a manic episode, Plaintiff experienced mood swings ranging from severe depression to hyper, manic, and delusional behavior.  He did not remember the manic episodes other than imagining things.  (Tr. 24-25)

Plaintiff also testified that he lived in a trailer with the mother of his son, who worked from noon to 8:00 p.m. five to six days a week.  His mother was retired and lived about 45 minutes away.  Plaintiff did chores around the trailer and took care of his son while his girlfriend worked.  He also played baseball with his son.  While working in the past, Plaintiff did not experience a depressive episode at work.  He explained that he wold not go to work when he had an episode.  Plaintiff smoked a pack of cigarettes a day and drove to the grocery store, Wal-Mart, and the playground.  His son took the bus to Kindergarten.  Plaintiff did not drink alcohol.  The furthest Plaintiff would drive was to visit his mother, which was a 100 mile round-trip drive.  He was able to mow his lawn with a push mower.  (Tr. 25-29)

During the day, Plaintiff would go back to bed after putting his son on the bus.  His

medications caused him to sleep 12 hours at night and also caused his hands to tremble. Plaintiff testified that he would sleep until 3:00 p.m. then get his son off of the bus. Plaintiff further stated that he was unable to work because he worried about what people thought. He had difficulty being around other people every day, but he was able to be around crowds of people he did not work with. Plaintiff testified that the gossip that went around the factory bothered him. He had not looked for a job that had only few people because lacked experience. (Tr. 29-32)

Plaintiff's attorney also questioned him during the hearing. His attorney asked for additional time to submit treatment notes, and the ALJ agreed to keep the record open for 30 days. Plaintiff testified that his prescription medications included Lithium, Respidol, Thioridazine, and Ambien CR. He had not recently addressed his problems with getting too much sleep with his doctor. Plaintiff reiterated that he worked for Lumby Enterprises from 1991-1992 and again from 2002-2006. His uncle owned the company but eventually fired him. Plaintiff stated that his uncle made accommodations for him such as allowing him to take many breaks and miss work. He did not have any problems with specific co-workers but mentioned that he overheard gossip and wondered whether they were saying bad things about him as well. The gossip in the factory setting along with his depression became too much for Plaintiff to handle. (Tr. 32-37)

In addition, Plaintiff testified that he needed help going to appointments with strangers. He did not need help with doctor or lawyer appointments but stated that he was unable to go early in the morning because he could not wake up. He reiterated that he had a fear of what people thought along with the depression. While he was able to take care of his child, he had days when he put off housework because he was depressed. Plaintiff also testified that he had tension with his son's mom

because he would cancel plans with his son due to depression. For instance, he had promised his son that they would look at toys at Wal-Mart, but Plaintiff could not motivate himself to go. (Tr. 37-39)

Plaintiff further testified that he needed help with finances. His mother paid everything but rent for the lot. He was unable to pay the bills because he was out of practice. His mother also kept track of the joint bank account she held with Plaintiff. (Tr. 39-40)

Plaintiff was in a car accident in 2005 during a manic episode. He had a drivers license and still drove alone. However, family members took away the keys when he experienced manic mood swings. The last time they took his keys was 3 years before the hearing. Plaintiff's mother filled out his social security forms because she had a better memory of the events and hospital visits. He sometimes had trouble understanding the questions and following the instructions. In addition, Plaintiff stated that he had trouble finishing things, such as mowing the lawn. His mood would change, and he would not complete the task. Plaintiff did not socialize much and testified that he had a fear of social environments that stemmed from his manic depressive illness. He did not have any friends other than one he saw rarely. (Tr. 40-43)

Plaintiff's mother, Audrey Yarbrough, also testified on Plaintiff's behalf. Ms. Yarbrough worked for family advocacy community training as the founder and program director. She visited her son once or twice a week to monitor his moods. She stated that Plaintiff's moods had been better, but a couple years ago he could go from being mildly depressed to psychotic in less than 3 days. However, he always had a low level of depression which would increase as a result of a particularly stressful event, such as getting lost on his way to his attorney's office. Ms. Yarbrough and her husband made sure that Plaintiff stayed on top of his appointments and monitored household

chores. Sometimes they drove him places if they thought he would get lost. (Tr. 43-46)

Ms. Yarbrough also testified that Plaintiff used marijuana as a teenager to self-medicate his depression. She was unaware of other drugs and did not believe he currently used drugs. The death of Plaintiff's uncle/employer triggered a full-blown manic episode. Plaintiff's uncle had accommodated him at work so that he could be absent or leave early when sick. Ms. Yarbrough stated that she would get a call if Plaintiff was absent from work and would have to go wake him up when he was in a deep depression. She estimated that Plaintiff missed 2 to 4 days of work per month. He would show up late to work at least once a week. (Tr. 46-48, 52-53)

In addition, Ms. Yarbrough testified that she helped Plaintiff fill out his Social Security forms because he had mild learning disabilities and poor memory. He completed tasks very slowly due to his depression. He also slept for hours during the day and usually slept 12 to 14 hours at night. Ms. Yarbrough and her husband kept tabs on Plaintiff when he watched his son and would retrieve the child if Plaintiff appeared manic. (Tr. 48-50)

A Vocational Expert (VE) also testified at the hearing. The VE first identified Plaintiff's vocational history. The ALJ then posed a hypothetical asking the VE to assume an individual that could understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for 2 hour segments during an 8 hour workday; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others was casual and infrequent. Further, the individual should not work in a setting including constant regular contact with the general public. Given these limitations, the VE testified that the individual would be able to return to Plaintiff's past work as a packer of treadmills, parts polisher, and laborer. (Tr.

53-56)

For the second hypothetical, the ALJ added that the individual should not work in a setting which included constant and regular contact with the general public or supervisors. The VE answered that the individual could still perform treadmill packing and polishing work as performed in the national economy. (Tr. 56-57)

In hypothetical three, the ALJ asked the VE to add that the individual would not be able to maintain concentration and attention for 2 hour segments over an 8-hour period of the day, along with absences for medical reasons up to 6 times a month. The VE answered that he did not know of any jobs such individual could do on a regular basis. (Tr. 57)

Plaintiff's attorney also questioned the VE and asked him to assume an individual of Plaintiff's age, education, and past relevant work. This individual had marked limitations in his ability to cope with normal work stress, function independently, behave in an emotionally stable manner, maintain reliability, relate in social situations, maintain regular attendance and be punctual, complete a normal workday and work week without interruptions from symptoms, maintain attention and concentration for more than 2 hours, perform at a consistent pace without an unreasonable number and length of rest periods, sustain an ordinary routine without special supervision, respond to changes in a work setting, and work in coordination with others. The VE answered that such individual would be unable to perform either Plaintiff's past relevant work or any other jobs. (Tr. 57-60)

In a Disability Report – Adult, Plaintiff stated that he became so depressed that he could not get up and go to work. He missed so many days he would eventually be terminated. (Tr. 147) Further, in a Function Report – Adult, Plaintiff reported that his day consisted of getting up and

showering; eating breakfast; feeding his son and helping him dress; and watching a lot of TV. If he had problems sleeping and could not wake up, Plaintiff's mother watched Plaintiff's son. Plaintiff tried to look for work but was unsuccessful. He could perform most daily functions such as taking care of personal needs, preparing simple meals, and performing house and yard work when he did not sleep all day and night and if he felt well. His interests included watching TV, playing ball with his son, and playing guitar. He did these things well when his mood was stable. He spent time with his son's mother and his parents. He called a child hood friend about once a month, and he went to church once or twice a month. Plaintiff also went to the movies with his brothers once a month. In addition, Plaintiff's condition caused problems with memory, completing tasks, concentration, understanding, and following instructions. His ability to pay attention depended on his mood, and he could not finish what he started or follow written instructions if his mood was depressed. He did not handle stress well. (Tr. 157-64)

### III. Medical Evidence

Plaintiff was admitted to St. Joseph Health Center on May 7, 2003 and October 28, 2005 for treatment of bipolar disorder under the care of Dr. John P. Canale.[1] The admission notes indicated that Plaintiff had a long history of bipolar disorder and had been previously hospitalized. Plaintiff had not been taking his medication and developed manic, grandiose, and psychotic symptoms. In 2003, the police brought him to the ER for admission. In 2005, Plaintiff was found wandering in a parking lot. He had been unable to work or sleep. He felt as though he had special powers and was going to win the lottery. In addition, he was unmanageable at home and was admitted for further

---

[1] Plaintiff was also admitted on May 27, 2003 at St. Joseph's Health Center for ECT (electroconvulsive therapy) treatments. (Tr. 212)

stabilization on medication. His Global Assessment Functioning (GAF) scores upon both admissions were 35.[2] The Discharge Summary dated October 31, 2005 indicated that Plaintiff was agitated, manic, and psychotic upon admission. He began to calm down after taking Lithium, Risperdal, and Thorzine. Dr. Canale discharged Plaintiff with a diagnosis of bipolar affective disorder and a GAF of 45.[3] Plaintiff's condition was "improving" but his prognosis was guarded. His discharge medications included Lithium, Risperdal, Cogentin, and Thorazine. (Tr. 202-31)

Plaintiff also received psychiatric treatment on an outpatient basis from Dr. Canale. On August 1, 2006, Plaintiff reported that the medications made him sleep too much, so Dr. Canale decreased Plaintiff's Thorazine prescription. On November 9, 2006, Plaintiff reported doing well with no psychotic symptoms. Plaintiff was to continue taking Thorazine, Risperdal, Cogentin, and LiCo3. On January 4, 2007, Dr. Canale's office prescribed Chlorpromazine. Plaintiff stated that Trazadone did not work and requested something else for sleep. On March 2, 2007, Plaintiff again reported that he was not sleeping well, not working, and applying for disability. He denied being depressed. Dr. Canale added Ambien to Plaintiff's medication regimen. (Tr. 233-34)

On June 29, 2007, October 19, 2007 and February 13, 2008, Dr. Canale noted that Plaintiff was "well," "doing good," or "doing better." Although he reported improved sleep on June 29, 2007, he later complained that he was not sleeping well. Dr. Canale also added Mellaril to Plaintiff's

---

[2]  A GAF of 31 through 40 represents "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

[3]  A GAF of 41 to 50 indicates "Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR 34.

medications.  On July 9, 2008, Plaintiff was doing well and was spending time with his son.  (Tr. 265-267)

On May 7, 2007, Dr. Canale completed a form at the request of the Office of Disability Determinations.  He reported he had treated Plaintiff for several years.  When Dr. Canale last saw Plaintiff on March 2, 2007, Plaintiff's mental status was oriented times three, and his memory was intact.  His concentration was impaired; his thought content and process were within normal limits; his mood was depressed;and his affect was labile.  He had no psychotic features.  Dr. Canale further reported Plaintiff experienced the following symptoms frequently: anhedonia, sleep disturbance, abnormal psychomotor activity, decreased energy, feelings of guilt or worthlessness and difficulty concentrating.  Dr. Canale noted Plaintiff had symptoms of impulsivity and inattention, and at times he had suicidal thoughts and hallucinations or delusions.  Plaintiff's activities of daily living were restricted, and his ability for social functioning was impaired.  In addition, Plaintiff exhibited deficiencies in concentration, persistence and pace, along with repeated episodes of deterioration in a work-like setting.  Dr. Canale believed that Plaintiff was able to manage funds.  He also reported Plaintiff had been medically compliant.  (Tr. 236-37)

Dr. Canale completed a Mental Medical Source Statement on July 6, 2007.  He opined Plaintiff had marked limitations in his ability to cope with normal work stress, function independently, behave in an emotionally stable manner, and maintain reliability. Further, he found Plaintiff had a marked limitation in his ability to relate in social situations and moderate limitation in the ability to interact with the general public, accept instructions and respond to criticism, and maintain socially acceptable behavior.  With regard to concentration, persistence and pace, Dr. Canale found Plaintiff

had marked limitation in seven abilities, including the ability to maintain regular attendance and be punctual and the ability to maintain attention and concentration for extended period. He was mildly limited in his ability to understand and remember simple instructions and moderately limited in his ability to make simple work-related decisions. Dr. Canale further reported that Plaintiff had one or two episodes of decompensation in the past year. He opined that Plaintiff had substantial losses in the abilities to understand, remember and carry out simple instructions; to make judgments that are commensurate with the functions of unskilled work; to respond appropriately to supervision, co-workers and usual work situations; and to deal with changes in a routine work setting. Dr. Canale stated that the limitations had lasted 12 continuous months and that the onset date was years prior to his report. (Tr. 261-64)

Plaintiff underwent a psychological consultative evaluation by Michael Armour, Ph.D., on May 8, 2007 at the request of the Office of Disability Determinations. Dr. Armour's evaluation was based upon a clinical interview with Plaintiff and a review of the records he received from Disability Determinations. Upon mental status exam, Plaintiff was oriented to person, place and time; his speech was normal and flowed in a logical, goal-directed manner; his mood was subdued during the interview; his affect was limited in the range in that he showed little emotional expression or variation although the emotion he did show was appropriate; and he was fidgety throughout the evaluation. Plaintiff denied experiencing symptoms of audible thoughts or auditory or visual hallucinations. His thought content was negative for current bizarre, persecutory, or grandiose beliefs. Plaintiff reported problems sleeping and past symptoms of mania and depression. While he denied current suicidal ideation, he reported at least one suicide attempt. Plaintiff's intellect was average, with his memory

grossly intact.  Dr. Armour diagnosed bipolar I disorder and cannabis abuse by history and identified Plaintiff as having chronic mental illness and poor work history.  He assigned a GAF score of 55-60.[4] (Tr. 239-43)

Dr. Armour also completed a Medical Source Statement based upon his evaluation.  Dr. Armour opined that at the current time Plaintiff suffered mild to occasionally moderate impairment in his ability to understand and recall instructions.  He explained Plaintiff's ability to understand and recall information was likely more impaired when he suffered more acute symptoms of mania or depression, but he had presented as more euthymic during the interview.  Further, Dr. Armour stated that Plaintiff suffered moderate to at times severe impairment in his ability to sustain concentration and stick with tasks.   He found Plaintiff to have mild to occasionally moderate impairment in his ability to interact socially and adapt to his environment.  Plaintiff would not need assistance in managing funds.  (Tr. 243-44)

State Agency psychological consultant James Spence, Ph.D., completed a Mental Residual Functional Capacity Assessment on May 18, 2007.  He opined Plaintiff was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.  Dr. Spence found no other significant limitations.  (Tr. 258-59)

Dr. Spence also completed a Psychiatric Review Technique form, finding that Plaintiff's Bipolar Disorder caused only mild restrictions to activities of daily living and mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and

_____

[4]  A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

pace; and no repeated episodes of decompensation. He based this opinion on the fact that Plaintiff appeared stable on medications and denied depressive symptoms in March 2007. (Tr. 246-56)

Dr. Canale completed a second Mental Medical Source Statement on August 21, 2009, which was submitted to the Appeals Council. He opined Plaintiff had marked limitations in all activities of daily living; moderate and marked limitations in social functioning; and moderate and marked limitations in concentration, persistence and pace. Dr. Canale further opined that Plaintiff could perform the following for a total of 0-2 hours during a day: apply commonsense understanding to carry out simple one- or two-step instructions; interact appropriately with coworkers; interact appropriately with supervisors; and interact appropriately with the general public. He stated that Plaintiff's psychologically based symptoms would cause him to miss work three or more times per month and would cause him to be late for work or need to leave work early three or more times per month. Dr. Canale stated the assessed limitations had existed at the assessed severity for years. The most current diagnosis was bipolar disorder. (Tr. 270-73)

## IV. The ALJ's Determination

In a decision dated February 27, 2009, the ALJ found that Plaintiff first met the insured status requirements as of May 26, 2006, the alleged onset date and that the date last insured was September 30, 2011. He had not engaged in substantial gainful activity since May 16, 2006. Plaintiff had bipolar disorder and a reported history of substance abuse. However, he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 68-70)

The ALJ further found that Plaintiff was without limitations of exertion and was physically capable of heavy work. In addition, Plaintiff's mental impairments did not preclude understanding,

remembering, and carrying out at least simple instructions and non-detailed tasks. He could maintain concentration and attention for 2 hours segments during an 8-hour period. In addition, Plaintiff could appropriately respond to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent. He could not work in a setting with constant and regular contact with the general public. Based on the VE's testimony, the ALJ determined that Plaintiff could perform his past relevant work as a packer and a parts polisher. Thus, the ALJ concluded that Plaintiff had not been under a disability from May 16, 2006 through the date of the decision. (Tr. 70-76)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that he is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42

14

U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[5] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI.  Discussion

In his Brief in Support of the Complaint, the Plaintiff asserts that the ALJ failed perform a proper analysis of the medical opinions in the record and failed to assign proper weight to the opinion of Plaintiff's treating psychiatrist.  In addition, Plaintiff argues that the ALJ failed to include a narrative discussion of the rationale for the RFC determination and that the findings were not supported by the medical evidence.  Finally, Plaintiff contends that the ALJ failed to make explicit findings regarding the demands of Plaintiff's past relevant work as required by SSR 82-62.  The Defendant, on the other hand, maintains that the ALJ properly evaluated the medical records. Further, Defendant asserts that substantial evidence supports the RFC determination.  Defendant also contends that the ALJ properly found that Plaintiff could return to his past relevant work.  The undersigned finds that the ALJ failed to accord adequate weight to Plaintiff's treating physician.

Plaintiff first contends that the ALJ did not assign proper weight to Plaintiff's treating

---

[5]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

psychiatrist, Dr. Canale. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

In the instant case, Dr. Canale was Plaintiff's treating physician, and the record demonstrates that Dr. Canale treated Plaintiff for bipolar disorder over the course of several years. (Tr. 202-34, 265-68) The regulations define "treating source" as: "[claimant's] own physician, psychologist, or other acceptable medical source who provides [him], or has provided [him], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [him]." 20 C.F.R. §§ 404.1502, 416.902. Further, while the ALJ discounted Dr. Canale's opinions based on lack of treatment notes or objective findings, the undersigned notes that Dr. Canale prescribed several psychotropic medications for Plaintiff's bipolar disorder. The ALJ found Dr. Canale's notes that Plaintiff was "doing better" to be very inconsistent with allegations of severe, disabling depression, bipolar syndrome, and mania. However, "'doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to [his] work-related functional capacity.'" Follett v. Astrue, No. 09-3167 (MJD/SRN), 2010 WL 4979011, at *14 (D. Minn. Nov. 16, 2010)

17

(quoting <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001)).

The ALJ appears to have relied more heavily on consulting psychologist, Dr. Spence, who based his opinions on the medical records and not an examination. "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." <u>Harris v. Barnhart</u>, 356 F.3d 926, 931 (8th Cir. 2004). But "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." <u>Shontos v. Barnhart</u>, 328 F.3d 418, 427 (8th Cir.2002). The SSA regulations recognize "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the SSA] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3). The ALJ noted that the state agency psychologist's reports were inconsistent with Plaintiff's subjective complaints and the findings of Dr. Canale. The RFC assessment appears to reflect Dr. Spence's conclusions. (Tr. 72, 258-60) However, the ALJ failed to explain how these opinions are superior to that of the treating doctor.

Because the ALJ erroneously relied on the opinions of the non-examining, consulting psychologist, the case should be remanded so that the ALJ may give each medical opinion proper weight under 20 C.F.R. §§ 404.1527. In this regard, the ALJ may wish to re-contact Dr. Canale for clarification or additional information.

Likewise, the undersigned finds that the ALJ's RFC assessment is not supported by substantial evidence. Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite

that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." <u>SSR 96-8p</u>, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present). The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" <u>Page v. Astrue</u>, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" <u>Sieveking v. Astrue</u>, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008).

Although the ALJ assessed the medical evidence, the ALJ jumped to the conclusion that the Plaintiff was capable of understanding, remembering, and carrying out at least simple instructions and non-detailed tasks; maintaining concentration and attention for 2 hours segments during an 8-hour period; appropriately responding to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent; and avoiding a setting with constant and regular contact with the general public. This determination, however, is void of any reference to specific medical or testimonial evidence demonstrating Plaintiff's ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. Indeed, the ALJ based his opinion on "the lack of documentation" in the record, not specific medical evidence supporting these limitations. In addition, it is well settled "that it is the duty of the ALJ to fully and fairly develop the record, even

when, as in this case, the claimant is represented by counsel." Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). The ALJ may not rely upon his or her own inferences. Id. at 858.

As such, substantial evidence does not support the ALJ's determination that plaintiff can work, where "work" requires an ability to perform on a daily basis in a competitive and stressful work environment. Hutsell v. Massanari, 259 F.3d 707, 713 (8th Cir. 2001) (citations omitted); see also SSR 96-8p (RFC is an assessment of an individual's ability to perform sustained work-related activities in a work setting for eight hours a day, five days a week, or the equivalent work schedule).

The undersigned therefore finds that this case should be remanded to the ALJ for further review. On remand, the ALJ should give proper weight to Plaintiff's physician. To the extent that the ALJ relies upon the non-examining consultative evaluation, the ALJ should explain his reasoning for giving those opinions greater weight. Further, the ALJ should support his assessment of Plaintiff's RFC with references to specific medical and non-medical evidence in the record. Finally, if the ALJ modifies Plaintiff's RFC, he should submit a new hypothetical question to a VE in determining whether Plaintiff is capable of performing the mental demands of his past work.

Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.


/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of March, 2011.